**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CLARENCE LEONARD HEARNS, JR.,
           *Plaintiff-Appellant,*

           v.

CAL TERHUNE; ROBERT POWELL,
Correctional Officer; R. NELSON,
Sergeant, Correctional Officer;
ALAN KAHN; F. DYMOND,
Correctional Captain at Calipatria
State Prison; SYLVIA GARCIA, Chief
Deputy Warden; LARRY SMALL,
Warden,
           *Defendants-Appellees.*

No. 02-56302

D.C. No.
CV-99-01461-JM

OPINION

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, District Judge, Presiding

Argued and Submitted
December 9, 2004—Pasadena, California

Filed June 30, 2005

Before: Procter Hug, Jr., Harry Pregerson, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Pregerson

7745

**COUNSEL**

Daniel L. Alexander, O'Melveny & Myers, Los Angeles, California, for the plaintiff-appellant.

Barbara C. Spiegel, Deputy Attorney General, State of California, San Francisco, California, for the defendants-appellees.

**OPINION**

PREGERSON, Circuit Judge:

Plaintiff-Appellant Clarence Leonard Hearns, Jr., is a Muslim inmate at Calipatria State Prison. In June 1999, Hearns filed a *pro se* complaint alleging violations of his civil rights under 42 U.S.C. § 1983. Specifically, Hearns alleged that several Calipatria State Prison officials violated his Eighth Amendment right to be free from cruel and unusual punishment when they failed to protect him from being attacked by fellow Muslim inmates. Hearns also claimed that he was subjected to inhumane conditions when he was later placed in

protective confinement for nine months in Calipatria's disciplinary segregation unit.

In February 2002, the district court *sua sponte* dismissed Hearns's original complaint for failing to state a claim, but granted him leave to amend. After Hearns filed his first amended complaint, the prison officials moved to dismiss that complaint under Federal Civil Procedure Rule 12(b)(6). In July 2002, the district court granted the motion to dismiss, ruled that Hearns's amended complaint failed to state a claim, and dismissed the complaint and the § 1983 action with prejudice. Hearns now appeals. We have jurisdiction under 28 U.S.C. § 1291, and we reverse and remand.

## I. FACTS AND PROCEDURAL HISTORY[1]

In May 1997, an inmate at Calipatria State Prison sent a memorandum to Defendant Chief Deputy Warden Sylvia Garcia explaining that the "ruling" Muslim inmates were trying to force other Muslim inmates to share their prayer oil. This memorandum was later forwarded to all prison administrators and to Defendant Alan Kahn, the prison's Islamic Chaplain. Shortly afterwards, prison officials and Chaplain Kahn received another letter that detailed secret boxing matches and beatings carried out by Muslim inmates in the prison chapels. As a result, beginning in July 1997, no Muslim inmate was allowed in the prison chapels unsupervised.

In August 1997, correctional officers discovered that Muslim inmates in Facility B of the prison were planning to beat a Muslim inmate in the Facility B chapel for questioning the authority of the ruling Muslim inmate group. News of the plan was reported to Defendant F. Dymond (a facility Captain) and relayed to Defendants Robert Powell (a correctional

---

[1]The following facts are taken from Hearns's *pro se* first amended complaint and are assumed true for purposes of our review. *See Jackson v. Carey*, 353 F.3d 750, 753 (9th Cir. 2003).

officer) and Chaplain Kahn. After the inmates' plan was discovered, the intended victim was moved from Facility B to Facility A.

Chaplain Kahn issued a memorandum in October 1997 addressing the continuing friction and violence between the Muslim inmates. In the memo, Chaplain Kahn threatened to suspend all Islamic services unless the safety of Muslim inmates and visitors attending services could be assured. The services, however, were never suspended.

In March 1998, another Muslim inmate housed in Facility B was targeted for attack by inmates from the ruling Muslims for disputing the ruling Muslims' authority. This inmate was relocated to Facility A. Nonetheless, he was stabbed approximately one year later in Facility A, allegedly at the request of the ruling Muslims in Facility B.

In April 1998, members of the ruling Muslim group stole prayer oil from Ware, a Muslim inmate. Hearns reported the incident to Chaplain Kahn. Hearns suggested that Ware's next shipment of prayer oil be delivered to Hearns instead of to Ware. Hearns would then secretly deliver the prayer oil to Ware. Chaplain Kahn agreed. Concerned that the ruling Muslim inmates would be upset, Hearns asked Chaplain Kahn not to tell the other inmates of this prayer oil delivery arrangement.

When the prayer oil arrived, Hearns delivered it to Ware. On that same day, other Muslim inmates learned of the secret delivery, either directly or indirectly, from Chaplain Kahn. The inmates were angry with Hearns and confronted him in a prison chapel. At that time, Hearns suffered no physical abuse. But two days later, Hearns was attacked by Muslim inmate Rushing in the chapel. Rushing was acting at the direction of Tubbs, Hankins, and Irby, inmates belonging to the ruling Muslim group. Following an investigation into the

attack, Hearns was moved from Facility A to Facility B because of concerns for his safety.

After Hearns was moved to Facility B, Chaplain Kahn gave Hearns the authority to teach Arabic classes in the chapel to fellow Muslim inmates. Chaplain Kahn also allegedly reported to several Muslim inmates, including Lino and Nichols, that Hearns believed there was a "messenger" after Muhammad and that Hearns did not follow the *sunnah*.[2] According to Hearns, holding such beliefs required him to be killed under the teachings of Islam.

The violence between Muslim inmates at Calipatria continued to escalate. In June 1998, Hearns told Correctional Officer Powell of ongoing disputes between the ruling group and Muslim inmates. These disputes centered around the ruling group's control over other Muslim inmates and which inmates would teach classes and give sermons. Correctional Officer Powell allegedly told Hearns that there was no need to worry and that he would relay Hearns's concerns to Chaplain Kahn and Captain Dymond.

Later that afternoon, Correctional Officer Powell announced to a group of Muslim inmates gathered in the Facility B chapel that Chaplain Kahn would come by the next day to help settle the disputes among the Muslim inmates. After the announcement, Lino (an inmate who allegedly learned from Chaplain Kahn that Hearns held impious beliefs) ordered Hearns to be beaten and stabbed.

The next day, Hearns arrived at the Facility B chapel to teach the morning Arabic class. Correctional Officer Powell greeted him at the door, checked his name off the list of attendees, and searched him for weapons. Soon after Hearns entered the chapel, several inmates filed in after him. These

---

[2]In Islam, the Arabic word *sunnah* has come to denote the way Muhammad lived his life and is the second source of Islamic jurisprudence.

inmates turned off the chapel lights, attacked Hearns from behind, and stabbed him numerous times. Even though Muslim inmates were not allowed in the chapel unsupervised, no correctional officers were present when Hearns was attacked. After being stabbed and beaten, Hearns saw Lino letting the attackers out of the chapel. Hearns grabbed Lino and held him until Correctional Officer Powell and several other correctional officers arrived. Hearns was then taken to the prison's central treatment center where he was treated for head lacerations, body cuts, and bruises.

Following release from the central treatment center three days later, Hearns was transferred from Facility B to Calipatria's disciplinary segregation unit. This transfer was done for his safety. Approximately two months later, Hearns informed the prison officials of various "health hazards" in the disciplinary segregation yard. Specifically, Hearns complained that the disciplinary segregation yard had "no working toilets, rusted and insect filled sinks, [and] stagnant pools of water infested with dead insects." Hearns also claimed that cold water, which was supplied to the prison's general population yards, was not available in the disciplinary segregation yard, despite the fact that the segregation yard's temperature regularly exceeded one hundred degrees. According to Hearns, these hazardous conditions forced him to avoid the prison yard "for fear of serious health concerns."

Hearns attempted to have these conditions corrected through the prison's administrative grievance process but failed. Once he exhausted the administrative grievance process, Hearns filed a *pro se* complaint in district court in June 1999, for violations of his civil rights under 42 U.S.C. § 1983. In addition to alleging that the prison officials had failed to protect him from being stabbed in the chapel, Hearns claimed that the officials subjected him to inhumane conditions while he was confined in disciplinary segregation.

In February 2002, the district court *sua sponte* dismissed, with leave to amend, Hearns's original complaint for failing

to state a claim. Approximately one month later, Hearns filed an amended complaint. Shortly after that, several of the Defendants filed a motion to dismiss Hearns's amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

The district court dismissed Hearns's amended complaint and action with prejudice on July 1, 2002. The district court ruled that Hearns's "failure-to-protect" allegations (related to the stabbing) did not satisfy the Eighth Amendment's subjective component because he did not allege deliberate indifference on the part of the prison officials. The court also ruled that Hearns's "conditions-of-confinement" allegations (related to the disciplinary segregation yard) were not sufficiently serious to meet the Eighth Amendment's objective component.

Hearns timely appealed the district court's dismissal order on July 25, 2002. A two-judge motions panel of our court issued an order directing Defendants to show cause why summary reversal of the district court's decision was inappropriate based on Hearns raising a colorable claim. Defendants filed a response to the order to show cause, and the panel's order was discharged on February 4, 2004. On April 15, 2004, we appointed *pro bono* counsel to represent Hearns. Hearns now appeals the district court's dismissal of his § 1983 action.

## II. DISCUSSION

A district court's dismissal of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure is reviewed *de novo*. *See Zimmerman v. City of Oakland*, 255 F.3d 734, 737 (9th Cir. 2001). We accept all allegations of material fact as true and construe them in the light most favorable to the prisoner. *See Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000). Because Hearns appeared *pro se* in the district court, we liberally construe the pleadings. *See Hughes v. Rowe*, 449 U.S. 5, 9-10 (1980); *Estelle v. Gamble*, 429 U.S. 97, 106

(1976); *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *see also Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir. 1987).

## A.   Hearns's "Failure-to-Protect" Claim

**[1]** " '[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.' " *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)). The failure of prison officials to protect inmates from attacks by other inmates may rise to the level of an Eighth Amendment violation when: (1) the deprivation alleged is "objectively, sufficiently serious" and (2) the prison officials had a "sufficiently culpable state of mind," acting with deliberate indifference. *Farmer*, 511 U.S. at 834 (internal quotations omitted). "[D]eliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835.

The district court dismissed Hearns's "failure-to-protect" claim on the ground that Hearns failed to show that the prison officials had a sufficiently culpable state of mind. According to the district court, the prison officials could not have inferred or otherwise known that the inmates who attacked Hearns in the chapel posed a substantial risk of harm to Hearns.

**[2]** We disagree. In his amended complaint, Hearns alleged facts detailing religiously motivated violence. According to Hearns, prison officials, including Chaplain Kahn, knew as early as May 1997 that a group of ruling Muslim inmates had planned and implemented attacks against other Muslim inmates who questioned the authority of the ruling group, failed to follow the ruling group's orders, or refused to share prayer oil. The prison officials also knew that the violence and friction involved differences between the prison's Muslim

community over religious leadership and services at the prison, yet did nothing to remedy this situation.[3]

[3] Hearns also claimed that the prison officials were aware of, yet disregarded, the danger posed by the specific inmates who had orchestrated previous attacks on other inmates who did not support the ruling Muslim group. In fact, inmates from the ruling Muslim group had previously committed a violent attack against Hearns.[4]

[4] Next, Hearns alleged facts that, when accepted as true and construed in the light most favorable to Hearns, raise an inference that the prison officials *created* the risk and then *facilitated* the attacks. For example, the amended complaint alleged that Chaplain Kahn knew that the ruling Muslim group was trying to steal prayer oil from other Muslim inmates. In deciding to help Ware (a fellow Muslim inmate), Hearns specifically asked Chaplain Kahn not to tell other inmates that Ware's prayer oil shipment had arrived or that Hearns would deliver the prayer oil to Ware. Nevertheless, Chaplain Kahn, either directly or indirectly, informed the ruling Muslim group that Hearns would secretly deliver the prayer oil to Ware. Later, Chaplain Kahn allegedly informed Muslim inmates that Hearns believed there was a prophet after Muhammad and that Hearns did not follow the teachings of Muhammad. Passing such information to the violent ruling Muslim group placed Hearns in danger and created a substantial risk that Hearns would be injured or killed.

Finally, the allegations regarding the attack against Hearns

---

[3]Although the prison officials threatened to suspend all Islamic services at the prison if the safety of all Muslim inmates could not be assured, allegedly they neither suspended the services nor took other measures to protect the Muslim inmates who were not part of the ruling group of Muslims.

[4]The first attack occurred in the Facility A chapel two days after Hearns accepted a fellow inmate's shipment of prayer oil.

at the Facility B chapel similarly raise an inference that the prison officials facilitated the attacks against Hearns. Correctional Officer Powell allegedly greeted Hearns at the chapel door and searched him for weapons. But, according to Hearns, Correctional Officer Powell was no longer present when Hearns was attacked by inmates belonging to the ruling Muslim group, even though Muslim inmates were not allowed in the chapel unsupervised. Indeed, prison officials knew that some of these same inmates had previously attacked Hearns or planned and implemented attacks on other Muslim inmates.

**[5]** The series of planned attacks and religious-related violence at Calipatria State Prison was "longstanding, pervasive, [and] well-documented." *Farmer*, 511 U.S. at 842 (internal quotations omitted). "[S]uch evidence could be sufficient to permit a trier of fact to find that the [prison officials] had actual knowledge of the risk." *Id.* at 842-43.

**[6]** In sum, Hearns adequately informed the parties and the district court of his Eighth Amendment "failure-to-protect" claim and showed that he may have been entitled to relief. *See Fontana v. Haskin*, 262 F.3d 871, 876-77 (9th Cir. 2001) ("Specific legal theories need not be pleaded so long as sufficient factual averments show that the claimant may be entitled to some relief."). The allegations in Hearns's *pro se* amended complaint were sufficient to raise an inference that the prison officials acted with deliberate indifference, or knew that Hearns faced a substantial risk of serious harm and "disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Accordingly, the district court erred in dismissing Hearns's "failure-to-protect" claim.

## B.   Conditions of Confinement in Disciplinary Segregation

As with his "failure-to-protect" claims, Hearns must make two showings to challenge his conditions of confinement. First, he must make an objective showing that the deprivation

was "sufficiently serious" to form the basis for an Eighth Amendment violation. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Second, Hearns must make a subjective showing that the prison official acted "with a sufficiently culpable state of mind." *Id.*

**[7]** In light of the Eighth Amendment's prohibition against cruel and unusual punishment, prison officials have a duty to ensure that inmates receive adequate food, clothing, shelter, and medical care. *See Farmer*, 511 U.S. at 832; *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996); *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982). Moreover, "[e]xercise has been determined to be one of the basic human necessities protected by the Eighth Amendment," *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993), and a long-term deprivation of outdoor exercise for inmates is unconstitutional, *see id.* at 1458 ("[T]his circuit has determined the long-term denial of *outside* exercise is unconstitutional.") (emphasis in original). *See also Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) ("There is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates."); *Toussaint v. Yockey*, 722 F.2d 1490, 1493 (9th Cir. 1984) (holding that the district court did not err in concluding that the denial of outdoor exercise to inmates assigned to administrative segregation for over one year raised "substantial constitutional question").

The district court dismissed Hearns's amended complaint for not meeting the objective component. According to the district court, the deprivations Hearns alleged were not sufficiently serious to violate the Eighth Amendment. Specifically, the district court ruled:

> Plaintiff has failed to allege any facts that would suggest he was subjected to inhumane conditions of confinement that imposed an excessive risk to his health or safety. For example, plaintiff does not

allege that he was deprived of water but only that ice cold water was not available to him. Plaintiff has failed to allege facts suggesting that the rusted sinks and stagnant pools of water filled with insects posed an excessive risk to his health and safety. Moreover, plaintiff simply alleges that the toilets did not work, which presumably means that they did not flush. Although certainly unpleasant, plaintiff fails to allege that the toilets were completely unusable for a period of time so that, for example, he was left with no alternative than to soil himself.

**[8]** The district court, however, did not take into account the nine month period in which Hearns was subjected to these conditions of confinement. "The circumstances, nature, and duration of a deprivation of [ ] necessities must be considered in determining whether a constitutional violation has occurred." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). Hearns alleged serious health hazards in the disciplinary segregation yard, including toilets that did not work; sinks that were rusted and stagnant pools of water infested with insects; and a lack of cold water even though the temperatures in the prison yard exceeded one hundred degrees. Hearns, in his complaint, asserted that these conditions kept him from using the yard.

**[9]** In one hundred degree plus weather, lack of drinkable water can be dangerous, thus precluding use of the yard. We need not decide whether the other allegations regarding the condition of the yard would independently, if proved, establish unconstitutional conditions, because with allegations that there was a lack of drinkable water, the complaint is sufficient to state a cause of action. The allegations in Hearns's complaint are not entirely clear with regard to whether there was no water available, no cold water available, or no ice water available. Nonetheless, Hearns complained of "health hazards" and "serious health concerns," requested "clean water containers," and alleged very high temperatures of "over 100

degrees plus." For purposes of a 12(b)(6) motion, these allegations are adequate to state a claim of unconstitutional prison conditions. *Cf. Keenan*, 83 F.3d at 1089-92 (recognizing that deprivation of outdoor exercise, excessive noise, 24 hour lighting, and inadequate ventilation, food, and water violate the Eighth Amendment rights of inmates); *see also Johnson*, 217 F.3d at 732 (noting that "[m]ore modest deprivations can also form the objective basis of a violation, but only if such deprivations are lengthy or ongoing"). Accordingly, we conclude that the district court erred in dismissing Hearns's "conditions-of-confinement" claim.

## III.   CONCLUSION

"A complaint should not be dismissed [under 12(b)(6)] unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002); *see also Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Hearns's *pro se* amended complaint may not have been artfully drawn, but it did provide the prison officials with fair notice of his claims and the grounds upon which they rested.[5] *See Conley*, 355 U.S. at 47.

[10] "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982). At a minimum, Hearns alleged facts that: (1) raised an inference that the prison officials knew of the risk that certain inmates would attack Hearns, yet failed to take reasonable measures to abate it; and (2) showed that he was exposed to serious health hazards in the disciplinary segrega-

---

[5]Hearns's appointed counsel is directed to file a second amended complaint which more clearly sets forth Hearns's § 1983 claims.

tion yard for a nine month period. Accordingly, we **REVERSE** the district court's order dismissing Hearns's § 1983 action and **REMAND** for further proceedings.