**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RODEL E. RODIS,
            *Plaintiff-Appellee,*

v.

CITY AND COUNTY OF SAN
FRANCISCO, a municipality,
            *Defendant-Appellant,*

LIDDICOET, San Francisco Police
Officer; BARRY, San Francisco
Police Sergeant; ALEX FAGAN, San
Francisco Police Chief,
            *Defendants-Appellants,*

            and

SAN FRANCISCO POLICE
DEPARTMENT,
            *Defendant.*

No. 05-15522

D.C. No.
CV-04-00314-MMC

OPINION

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

On Remand From The United States Supreme Court*

Filed March 9, 2009

Before: Dorothy W. Nelson and Consuelo M. Callahan,
Circuit Judges, and Cormac J. Carney,** District Judge.

*This case is hereby resubmitted.

**The Honorable Cormac J. Carney, United States District Judge for
the Central District of California, sitting by designation.

2955

Opinion by Judge D.W. Nelson

## COUNSEL

Scott D. Wiener, San Francisco, California, for the defendants-appellants.

Lawrence W. Fasano, Jr., San Francisco, California, for the plaintiff-appellee.

## OPINION

D.W. NELSON, Senior Circuit Judge:

Rodel E. Rodis brought suit under 42 U.S.C. § 1983 against, *inter alia*, two San Francisco police officers, alleging

a violation of his Fourth Amendment rights during a February 2003 arrest. The district court rejected the assertion of qualified immunity by the police officers. Defendants filed an interlocutory appeal, and, in 2007, we affirmed. The Supreme Court granted Defendants' petition for a writ of certiorari, vacated our decision, and remanded for further consideration, in light of *Pearson v. Callahan*, 555 U.S. ___, No. 07-751, slip op. 1 (Jan 21, 2009). We now reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 17, 2003, Rodel E. Rodis, an attorney and a locally elected public official, entered a drugstore near his office to purchase a few items. He tendered a 1985 series $100 bill, which lacked the security thread, watermarks, microprinting, and other anti-counterfeiting features of current $100 bills.

The cashier examined the bill for authenticity, and asked the store manager, Dennis Snopikov, for assistance. Because he suspected that the bill was counterfeit, Snopikov took it to the store office to compare it to other $100 bills in the store's safe. While Snopikov was in the office, Rodis pulled another $100 bill from his wallet and paid the cashier. After determining that the second bill was authentic, the cashier gave Rodis his change, his receipt, and the purchased items. Snopikov returned to the front of the store, and tested the bill with a counterfeit detector pen, which indicated that it was authentic. He remained suspicious, however, because of the bill's appearance and texture, and told Rodis that he was going to call the police so that they could settle the issue. Rodis was frustrated with the delay, but remained in the store willingly until the officers arrived.

Sergeant Jeff Barry, Officer Michelle Liddicoet, and two other police officers arrived on the scene. Snopikov conveyed his suspicions, and some of the officers examined the bill themselves. The officers tried the counterfeit detector pen on

a folder — the marking, however, indicated that the folder was also genuine United States currency. The officers concluded that the bill was probably counterfeit, but, because they were uncertain, decided it would be necessary to call the United States Secret Service to get an expert opinion. Because they believed it would be easiest to continue the investigation from the police station, they arrested Rodis on suspicion of violation 18 U.S.C. § 472, which criminalizes the possession and use of counterfeit currency. No effort was made to investigate Rodis's state of mind.

Liddicoet and another officer handcuffed Rodis and transported him to the police station. Rodis was restrained while the officers called the Secret Service hotline and left a message. After approximately thirty minutes, a Secret Service agent returned the call. The police and the agent discussed the details of the bill in question for five to ten minutes, during which the agent confirmed that the bill was, in fact, genuine. The officers released Rodis from custody, removed his handcuffs, and drove him back to the drugstore. The entire incident lasted about one hour.

On October 1, 2003, Rodis filed suit against the City and County of San Francisco, the San Francisco Police Department, the police chief, and Sergeant Barry and Officer Liddicoet. The complaint alleged false arrest and use of excessive force in violation of Rodis's Fourth Amendment rights, conspiracy to violate Rodis's rights, as well as several state law claims, including false arrest and intentional and negligent infliction of emotional distress.

On February 11, 2005, the defendants moved for summary judgment. The District Court granted the motion as to Rodis's conspiracy, municipal liability, and injunctive relief claims, and denied the motion in all other respects. The court held that because Barry and Liddicoet ("Defendants") lacked evidence of Rodis's intent to defraud, there was no probable

cause and the arrest was unlawful. It also found that the illegality of the arrest was clearly established at the time.

Defendants filed an interlocutory appeal to this court, and we affirmed the District Court's order. Defendants subsequently petitioned for a writ of certiorari. The Supreme Court granted the petition, vacated our decision, and remanded for further consideration in light of *Pearson v. Callahan*, 555 U.S. ___, No. 07-751, slip op. 1 (Jan. 21, 2009).

### *JURISDICTION*

"As a general rule, interlocutory appeals from determinations of qualified immunity are permissible." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1059 (9th Cir. 2006). "[T]he denial of a defendant's motion for summary judgment is immediately appealable where the defendant is a public official asserting the defense of qualified immunity, and the issue appealed concerns whether the facts demonstrated a violation of clearly established law." *Id.* (citing *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)). We therefore have jurisdiction over this case.

### *STANDARD OF REVIEW*

"We review de novo a district court's decision denying summary judgment on the ground of qualified immunity." *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 945 (9th Cir. 2003). "On appeal, the court of appeals . . . must resolve any factual disputes in favor of the plaintiff and decide the legal question as to whether the official's alleged conduct violated clearly established law." *Cunningham v. City of Wenatchee*, 345 F.3d 802, 807 (9th Cir. 2003).

### *DISCUSSION*

### A.

**[1]** "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. ___, No. 07-751, slip op. 1, 5-6 (Jan. 21, 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests - the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 6. "The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526.

**[2]** In *Saucier v. Katz*, 533 U.S. 194, 200 (2001), the Supreme Court mandated a two step sequence for resolving qualified immunity claims. First, a court must decide whether the alleged facts make out a violation of a constitutional right. *Id.* at 201. If the plaintiff satisfies the first step, the court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Id.* More recently, however, the Supreme Court revisited *Saucier* and concluded that "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory." *Pearson*, slip op. at 10. "The judges of . . . the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* Accordingly, we first turn to the question of whether the right asserted in this case was "clearly established."

B.

Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action. *Harlow*, 457 U.S. at 819. The constitutional vio-

lation must be "clearly established" at the time of the alleged misconduct. *CarePartners, LLC v. Lashway*, 545 F.3d 867, 882 (9th Cir. 2008).

"The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. "[T]he injured party need not establish that the Defendants behavior had been previously declared unconstitutional." *CarePartners*, 545 F.3d at 882 (internal quotation marks omitted). "The dispositive inquiry is 'whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.' " *Id.* at 883 (quoting *Saucier*, 533 U.S. at 202).

**[3]** The Defendants concluded that they had probable cause to arrest Rodis on suspicion of possession and/or use of counterfeit currency. "To support a conviction for possession of counterfeit currency with intent to defraud under 18 U.S.C. § 472, the government must prove three elements: (1) possession of counterfeit money; (2) knowledge, at the time of possession, that the money is counterfeit; and (3) possession with intent to defraud." *United States v. Rodriguez*, 761 F.2d 1339, 1340 (9th Cir. 1985); *see also Albillo-Figueroa v. INS*, 221 F.3d 1070, 1073 (9th Cir. 2000) (reciting the same elements); *United States v. McCall*, 592 F.2d 1066, 1068 (9th Cir. 1979) (per curiam) (same).

**[4]** "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)

(citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Indeed, "probable cause is a fluid concept - turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

**[5]** Although "[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction," *Adams v. Williams*, 407 U.S. 143, 149 (1972), we have held that "when specific intent is a required element of the offense, the arresting officer must have probable cause for that element in order to reasonably believe that a crime has occurred," *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994); *see also Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1499 (9th Cir. 1996) (holding that officers must have probable cause of a motorcyclist's actual knowledge that a certified helmet does not comply with helmet safety laws before ticketing).

**[6]** Possession of counterfeit currency is a specific intent crime. *United States v. Dearing*, 504 F.3d 897, 902 (9th Cir. 2007) (upholding a jury instruction defining "intent to defraud" as "the specific intent to deceive or cheat"); *United States v. Cloud*, 872 F.2d 846, 852 n.6 (9th Cir. 1989) (defining "intent to defraud" as "to act wilfully, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself"); *United States v. DeFilippis*, 637 F.2d 1370, 1373 (9th Cir. 1981) ("The key element of section 472 is its mens rea, the specific intent to defraud."). Thus, it was clearly established that the Defendants were required to have probable cause of Rodis's specific intent to defraud the store for a lawful arrest.

In evaluating the totality of the circumstances in this case, however, we embark on unchartered waters. Defendants assert that they had probable cause as to Rodis's intent based solely on the evidence suggesting that the bill might have been fake. Rodis contends that without specific evidence of his intent to defraud, above and beyond the tender of a potentially counterfeit bill, the arrest was unlawful.

**[7]** This circuit has never addressed this issue.[1] All of the other circuits to have answered this question, however, have found that "[t]he passing of a counterfeit note coupled with an identification of the person who passed the note furnishes probable cause to arrest the individual identified as passing the note." *United States v. Everett*, 719 F.2d 1119, 1120 (11th Cir. 1983) (per curiam) (collecting cases); *see, e.g.*, *United States v. Armstrong*, 16 F.3d 289, 294 (8th Cir. 1994); *United States v. Hernandez*, 825 F.2d 846, 849 (5th Cir. 1987); *United States v. Allison*, 616 F.2d 779, 782 (5th Cir. 1980); *United States v. Trotter*, 433 F.2d 113, 115 (7th Cir. 1970); *United States v. Smith*, 357 F.2d 318, 320 (6th Cir. 1966) (per curiam); *cf. United States v. Ayers*, 426 F.2d 524, 529 (2d Cir. 1970). In *Pearson*, the Supreme Court noted that "where the divergence of views on . . . [the constitutionality of the alleged misconduct] [i]s created by the decision of the Court of Appeals in th[e] case, it is improper to subject petitioners

---

[1]Defendants point to *United States v. Bates*, 352 F.2d 399 (9th Cir. 1965) (per curiam) and *United States v. Ford*, 461 F.2d 534 (9th Cir. 1972) (per curiam), in which we upheld the probable cause determinations for arrests on suspicion of possession of counterfeit currency. The factual descriptions in both opinions, however, are meager, and it is impossible to determine what facts were deemed sufficient for probable cause. *See Ford*, 461 F.2d at 534; *Bates*, 352 F.2d at 400 (describing "the tow truck operator . . . who filled in chinks of circumstance to give probable cause."); *see also United States v. Blum*, 432 F.2d 250, 252 (9th Cir. 1970) (upholding probable cause but not describing the circumstances surrounding the passing of the counterfeit bills). Most importantly, all three of these cases predate *Gasho*, 39 F.3d at 1428, which was the first case to address the interplay between specific intent and probable cause.

to money damages for their conduct." Slip op. at 20. Thus, regardless of whether we determine that evidence beyond the tender of a counterfeit bill was required, Defendants are entitled to qualified immunity. Were we to decide that there was a violation, we would create a circuit split and Defendants would not have been on notice that their conduct was unlawful. Were we to decide that this evidence was not required, Rodis's claim would fail in the first instance. Because it is unnecessary to disposition of this case, we decline to decide this question.

**[8]** Assuming that tender of a counterfeit bill was enough to establish probable cause, we must decide whether the officers' belief that the bill was fake was reasonable. The Supreme Court has "recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present." *Anderson*, 483 U.S. at 641; *see also Hunter v. Bryant*, 502 U.S. 224, 228 (1991). "[I]n such cases those officials . . . should not be held personally liable." *Anderson*, 483 U.S. at 641. "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter*, 502 U.S. at 229 (internal quotation marks omitted). It is undisputed that Rodis's $100 bill looked odd, and that it lacked many modern security features. Although the arrest was unfortunate, we cannot say that the officers belief that it was fake was plainly incompetent. The arrest, therefore, was not clearly established as unlawful.

## *CONCLUSION*

For the foregoing reasons, we conclude that Defendants were entitled to qualified immunity. We reverse the District Court's order, and remand for entry of judgment.

**REVERSED.**