FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GREGORY LYNN NORWOOD,
                *Plaintiff-Appellee,*

v.

STEVE J. VANCE; MIKE KNOWLES,
Warden, CSP-Sacramento; THOMAS
P. GOUGHNOUR; MICHAEL F.
MARTEL; DAVID I. WILLEY; CHERYL
PLILER, Former Warden at CSP;
JAMES P. WALKER, Associate
Warden,
                *Defendants-Appellants.*

No. 07-17322

D.C. No.
CV-03-02554-
GEB/GGH

GREGORY LYNN NORWOOD,
                *Plaintiff-Appellee,*

v.

STEVE J. VANCE; MIKE KNOWLES,
Warden, CSP-Sacramento; THOMAS
P. GOUGHNOUR; JAMES P. WALKER,
Associate Warden; DAVID I.
WILLEY; CHERYL PLILER, Former
Warden at CSP,
                *Defendants-Appellants,*

and

MICHAEL F. MARTEL,
                *Defendant.*

No. 08-15778

D.C. No.
2:03-CV-02554-
GEB-GGH

ORDER AND
AMENDED
OPINION

431

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, District Judge, Presiding

Argued and Submitted
October 29, 2008—Sacramento, California

Filed July 9, 2009
Amended January 7, 2010

Before: Alex Kozinski, Chief Judge, Sidney R. Thomas and
Consuelo M. Callahan, Circuit Judges.

Opinion by Chief Judge Kozinski;
Dissent by Judge Thomas

## COUNSEL

Carter White, Supervising Attorney, and Erin Haney, Certified Law Student, U.C. Davis School of Law, King Hall Civil Rights Clinic, Davis, California, for the plaintiff-appellee.

Christopher J. Becker, Esquire, Jim Sobolewski, James Flynn, Deputy Attorneys General, Office of the California Attorney General, Sacramento, California, for the defendants-appellants.

## ORDER

The opinion is amended as follows:

Page 629, column 1, line 26

Add a footnote after <Defendants appeal.> stating: <Only an Eighth Amendment outdoor exercise claim is before us on this appeal. We therefore express no view as to the race-based aspect of the lockdowns or any potential Equal Protection claim.>

Page 632, column 2, lines 36-37

Replace <constitution> with <Eighth Amendment>

Page 633, column 1, line 35

Replace <lawful> with <consistent with the Eighth Amendment>

Appellee's Petition for Panel Rehearing and Rehearing en banc is otherwise denied. *See* Fed. R. App. P. 35, 40. Judge Thomas would grant the petition.

No further petitions for rehearing or rehearing en banc may be filed.

---

**OPINION**

KOZINSKI, Chief Judge:

We consider when prison officials may be held liable for depriving inmates of outdoor exercise.

**Facts**

Gregory Norwood was incarcerated at CSP-Sacramento, a maximum security prison, during a particularly violent period in the prison's history. Norwood brought this section 1983 action alleging that prison officials violated the Eighth Amendment when they denied him outdoor exercise during four separate extended lockdowns over the course of two years.

The prison initiated these lockdowns after serious inmate assaults on staff. During the lockdowns, inmates were confined to their cells and normal programs were suspended while officials investigated the violence. Based on what they learned, officials gradually eased restrictions on specific gangs, ethnic and racial groups, restoring outdoor exercise sooner for inmates who they believed would pose less risk of further violence. Norwood was not a gang member, but gang members often pressured unaffiliated inmates of the same race or ethnicity to assist them. Prison officials therefore believed that limiting the scope of lockdowns to gang members would be inadequate to ensure safety.

During this two-year period, there were also numerous inmate-on-inmate attacks. Officials did not always initiate total lockdowns after such attacks. According to one defendant, the prison's response to inmate-on-inmate violence "[d]epends on the circumstances of the assault. . . . [I]f it's fisticuffs, and it's a one-on-one situation, no, we wouldn't lock down for that. If it's a slashing assault, or a stomping, or multiple inmates involved in a melee, then yes, we would lock down . . . ."

Officials initiated the first lockdown in early 2002 after eleven Hispanic inmates attacked four correctional officers, nearly killing one of them. Prison officials didn't know if the attack was planned or isolated. They also didn't know, and were never able to ascertain, who provided the weapons. The weeks following the attack brought a series of inmate-on-inmate attacks, including a homicide, as well as another attempted murder of an officer. Officials eventually decided it was safe to begin restoring normal programs, beginning with "critical workers." Norwood was in the second group of workers to resume outdoor exercise. His exercise had been suspended for about three months.

In early May, a black inmate stabbed an officer in a dining hall. Officials initiated a second lockdown but began restoring normal programs by the end of the month. By mid-July, prisoners other than blacks had resumed outdoor exercise. Even so, attacks on officers occurred during this lockdown, including a battery and an attempted battery. Norwood, who is black, was denied exercise for three months.

In the waning days of 2002, black inmates attempted to murder a correctional officer, and a number of black Crips attacked staff members. Officials initiated a third lockdown, during the course of which inmates committed four batteries or attempted batteries of officers and five batteries or attempted murders of inmates. During this lockdown, Nor-

wood's outdoor exercise was suspended for four and a half months.

In September of 2003, a black Crip attempted to murder an officer. Because of the seriousness of the incident and the fact that it was the fourth major assault on staff in a 19-month period, officers locked down all inmates and declared a state of emergency. Officers eventually determined that the attacker had acted alone and began restoring outdoor exercise. But the violence continued. Certain white inmates, and those celled with them, were locked down because of an attempted murder of an inmate in November, and certain Crips and their cellmates remained on lockdown from earlier violence. Norwood was denied outdoor exercise for two months.

A jury found that defendants violated Norwood's Eighth Amendment right to outdoor exercise but concluded that Norwood suffered no harm and thus awarded no compensatory damages. The jury did award $11 in nominal damages and $39,000 in punitive damages. The district court awarded $23,875.55 in attorney's fees. Defendants appeal.[1]

## Analysis

### I

Defendants claim the district court erred by refusing to give the following jury instruction:

> In considering whether defendants were deliberately indifferent to the need for outdoor exercise, the jury should consider that defendants had a competing obligation under the Eighth Amendment to ensure the safety of prisoners, including protecting prison-

---

[1]Only an Eighth Amendment outdoor exercise claim is before us on this appeal. We therefore express no view as to the race-based aspect of the lockdowns or any potential Equal Protection claim.

ers from each other. In considering these factors, you should give deference to prison officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and to maintain internal security in a prison.

The district court initially agreed to the language but, after plaintiff objected, declined to include it on the ground that "deference" was "undefined." Because defendants challenge the resulting jury instruction as an incomplete, and therefore incorrect, statement of the law our review is de novo. *Clem* v. *Lomeli*, No. 07-16764, slip op. at 6572 (9th Cir. June 2, 2009); *Dang* v. *Cross*, 422 F.3d 800, 804-06 (9th Cir. 2005).

Plaintiff argues that defendants failed to preserve their objection below. *See* Fed. R. Civ. P. 51(d)(2). But the record shows that defendants contested the district court's decision not to include the proposed language and made the grounds for their position clear, citing relevant authority. An "objection need not be formal," and defendants' proffered language was "sufficiently specific to bring into focus the precise nature of the alleged error." *Inv. Serv. Co.* v. *Allied Equities Corp.*, 519 F.2d 508, 510 (9th Cir. 1975). Nor did the district judge's vague statement that defendants "may" have an opportunity to change his mind counter the overall impression that raising the issue again via formal objection would be both "unavailing" and a "pointless formality." *Glover* v. *Bic Corp.*, 6 F.3d 1318, 1326 (9th Cir. 1993).

**[1]** It is well established that judges and juries must defer to prison officials' expert judgments. In *Bell* v. *Wolfish*, the Supreme Court explained:

[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judg-

> ment are needed to preserve internal order and discipline and maintain institutional security.

441 U.S. 520, 547 (1979). Six years later, the Court spelled out that deference requires "that neither judge *nor jury* freely substitute their judgment for that of officials who have made a considered choice." *Whitley* v. *Albers*, 475 U.S. 312, 322 (1985) (emphasis added). The Court confirmed that *Bell* remains good law in *Farmer* v. *Brennan*, its seminal opinion on challenges to conditions of confinement, which twice cited *Bell* with approval. 511 U.S. 825, 845, 847 (1994).

The district court declined to give the proposed instruction because the meaning of deference would not be "clear to a lay person." But "deference" is not Urdu or Klingon; it is a common English word. *See, e.g.*, Michael Crichton, *Airframe* 78 (1996) ("[S]he certainly knew where all the bodies were buried. Within the company, she was treated with a deference bordering on fear."). It may be true that deference has varied meanings, Dissent at 454 n.4, but so do most English words. If the district judge believed the term needed further context or definition, he could have provided it.

**[2]** Perfect or not, the defendants' proposed instruction brought the issue of deference to the district court's attention. "[T]he fact that the proposed instruction was misleading does not alone permit the district judge to summarily refuse to give any instruction on the topic." *Merrick* v. *Paul Revere Life Ins. Co.*, 500 F.3d 1007, 1017 (9th Cir. 2007). The district court omitted the instruction altogether, rather than modifying it to correct the perceived deficiency. The remaining instructions failed to alert the jury that the deliberate indifference standard "incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.' " *Farmer*, 511 U.S. at 845 (quoting *Spain* v. *Procunier*, 600 F.2d 189, 193 (9th Cir. 1979)). The dissent apparently believes that, because *Farmer* "incorporates" *Bell* deference, the use of language drawn from *Farmer* was ade-

quate to instruct the jury. Dissent at 452. But juries are not clairvoyant and will not know to defer unless they are told to do so.

**[3]** We have long recognized that additional instruction regarding deference is required in cases applying *Whitley* to allegedly excessive force by prison officials. *See* Ninth Circuit Manual of Model Jury Instructions § 9.24 (2007 ed.). The dissent accuses us of improperly extending the *Whitley* regime to a case involving conditions of confinement. Dissent at 451. But defendants' proposed instruction was not drawn from *Whitley*; it was drawn from *Bell*—itself a conditions of confinement case. *Bell*, 441 U.S. at 534, 547. Prison officials are entitled to deference whether a prisoner challenges excessive force or conditions of confinement. *See Whitley*, 475 U.S. at 322; *Farmer*, 511 U.S. at 845. Indeed, conditions of confinement and use of force are often flip sides of the same coin: A more restrictive confinement may diminish the need for force and vice versa.

**[4]** As the government recognized at trial, the court's instruction correctly stated *Farmer*'s deliberate indifference standard. But the court's failure to give additional guidance on deference rendered the instruction incomplete and misleading. And the error was also prejudicial. If properly instructed, the jurors might well have reached a different conclusion. Norwood has not met his burden of showing the verdict would "more probably than not" have been the same absent the error. *Clem*, slip op. at 6575. We therefore vacate the jury's verdict and damages awards.

## II

We would normally remand for a new trial, but as defendants are entitled to qualified immunity that is not necessary here. Our dissenting colleague may be right that defendants waived the immunity claim by failing to raise it to the district court during or immediately after trial. On appeal, however,

Norwood failed to argue waiver; rather, he addressed qualified immunity on the merits while arguing waiver of the two other principal issues in the case. In *Tortu* v. *Las Vegas Metropolitan Police Department*, 556 F.3d 1075 (9th Cir. 2009), cited by the dissent, *see* Dissent at 456, plaintiff explicitly argued that defendants had forfeited qualified immunity by failing to make the proper motion below. *Tortu*, 556 F.3d at 1081.

**[5]** It is "well-established" that a party can " 'waive waiver' implicitly by failing to assert it." *Tokatly* v. *Ashcroft*, 371 F.3d 613, 618 (9th Cir. 2004); *United States* v. *Garcia-Lopez*, 309 F.3d 1121, 1123 (9th Cir. 2002); *see also Wilson* v. *Kelkhoff*, 86 F.3d 1438, 1445 (7th Cir. 1996) (plaintiff waived defendant's waiver of absolute immunity defense). Norwood waived the defendants' waiver by addressing the claim on the merits without also making a waiver argument. *Cf. Chicano Educ. & Manpower Servs.* v. *U.S. Dep't of Labor*, 909 F.2d 1320, 1327-28 & n.5 (9th Cir. 1990) ("Yes, we are indeed holding that the Department has waived its right to argue that CEMS waived its right to ask for a waiver . . . ."). The dissent would have us raise the issue of waiver sua sponte and suggests that we have "discretion" not to reach defendants' qualified immunity claim. Dissent at 457-58. But "[t]his court will not address waiver if not raised by the opposing party." *United States* v. *Doe*, 53 F.3d 1081, 1802-83 (9th Cir. 1995) (quoting *United States* v. *Schlesinger*, 49 F.3d 483, 485 (9th Cir. 1995)). Even if we had such discretion, we believe the more prudent course is to resolve the case on the basis of the issues actually briefed and argued by the parties.

**[6]** When a party waives waiver, we proceed directly to the merits. *See, e.g.*, *Tokatly*, 371 F.3d at 618-24; *Doe*, 53 F.3d at 1083-84; *Wilson*, 86 F.3d at 1445-46. We do not, as the dissent suggests, Dissent at 458-59, engage in plain error review. Defendants are entitled to qualified immunity so long as a right to outdoor exercise in the midst of severe ongoing prison violence was not clearly established at the time defendants

acted. *See Saucier* v. *Katz*, 533 U.S. 194, 201-02 (2001). "The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted.*" *Id.* at 202 (emphasis added).

**[7]** Three factors weigh heavily in our analysis: First, as *Saucier* explains, the qualified immunity inquiry is highly context-sensitive, turning on whether it would be clear to a reasonable officer that denying outdoor exercise was unlawful "in the situation he confronted." *Id.* The extraordinary violence gripping the prison threatened staff and inmates alike, and there was a serious risk that gangs would press unaffiliated inmates like Norwood into service. *See* pp.436-38 *supra*. While Norwood argues that a reasonable officer would have known that denying outdoor exercise in the midst of ongoing prison violence violated his rights, he cites just one case *Allen* v. *Sakai*, 48 F.3d 1082 (9th Cir. 1995)—for the general proposition that the Ninth Circuit "is one of many [courts] that have held that there is a constitutional right to outdoor exercise for inmates."

But *Allen* does not hold that a prisoner's right to outdoor exercise is absolute and indefeasible, or that it trumps all other considerations. Plaintiffs in *Allen* survived summary judgment because prison officials there relied on "inconsequential logistical concerns" to justify denying outdoor exercise. *Id.* at 1088. Defendants here had substantial reasons for imposing the lockdowns: They were attempting to restore order during a series of brutal attacks, some lethal or nearly so. They did not place "inconsequential logistical concerns" above Norwood's need for outdoor exercise. And plaintiff offered no evidence that the lockdowns were meant to be punitive or were otherwise implemented in bad faith.

**[8]** Second, prison officials have a duty to keep inmates safe, and in particular to protect them from each other. *Farmer*, 511 U.S. at 832-33; *LeMaire* v. *Maass*, 12 F.3d 1444, 1462 (9th Cir. 1993). Officials must balance this imperative

against other obligations that our laws impose, such as providing outdoor exercise. When violence rises to unusually high levels, prison officials can reasonably believe it is lawful to temporarily restrict outdoor exercise to help bring the violence under control. We've explained that "prison officials have a right and a duty to take the necessary steps to reestablish order in a prison when such order is lost. This is for the benefit of the prisoners as much as for the benefit of the prison officials." *Hoptowit* v. *Ray*, 682 F.2d 1237, 1259 (9th Cir. 1982). Here, at least one prisoner had died; others (prisoners and guards) had been severely wounded. Defendants had to act decisively to stop the violence.

The dissent claims that the "jury reasonably rejected defendants' argument that unusual levels of violence justified the long-term deprivations in this case" because "defendants conceded on cross-examination that 'those types of [violent] incidents occur even when there is no lockdown,' with the same frequency, and that 'the violence is pretty steady.' " Dissent at 463-64 (emphasis omitted). But there's more to the former warden's testimony:

> While we were on lockdown status, these types of things continued to happen. *Either as we incrementally unlocked and released to the small yards for exercise, or sent—you know, releasing—lifting the privileges to go to meals or whatever, violence continued to happen*. And if that violence was— occurred based on a decision that we made that we felt it was safe, and we let the small group of prisoners out and something happened, then we would call back our prior decision. [Emphasis added.]

What we understand the warden to be saying is that the lockdowns *were* effective at curbing violence, and that violence resumed as privileges were restored.

Such decisions are not to be judged with the benefit of hindsight, in any event. It matters not whether the measures

taken actually worked but whether prison officials reasonably believed they would be effective in stopping the violence. At most, prison officials here may be faulted for erring on the side of caution by maintaining lockdowns for longer than necessary. But, when it comes to matters of life and death, erring on the side of caution is a virtue. Certainly, no officer could reasonably have anticipated that such prudence would be found to violate the Eighth Amendment.

**[9]** Third, when balancing the obligation to provide for inmate and staff safety against the duty to accord inmates the rights and privileges to which they are entitled, prison officials are afforded "wide-ranging deference." *Bell*, 441 U.S. at 547. When a "lockdown was in response to a genuine emergency," and "restrictions were eased as the prison administration determined that the emergency permitted," we may not lightly second-guess officials' expert judgments about when exercise and other programs could safely be restored. "These decisions are delicate ones, and those charged with them must be given reasonable leeway." *Hayward* v. *Procunier*, 629 F.2d 599, 603 (9th Cir. 1980).

**[10]** It would be particularly odd to hold that liability attaches in this case, where hindsight validates defendants' decisions. The record makes clear that a great deal of violence took place during outdoor exercise. While denying outdoor exercise for extended periods carried some risk of harm, officials' judgment that there was a greater risk of harm from allowing outdoor exercise was certainly reasonable. Indeed, Norwood suffered no injuries from attacks by other inmates or from being denied outdoor exercise—a fact the jury recognized by awarding no compensatory damages. Norwood might have fared less well had prison officials been less cautious. Although exercise is "one of the basic human necessities protected by the Eighth Amendment," *LeMaire*, 12 F.3d at 1457, "a temporary denial of outdoor exercise with no medical effects is not a substantial deprivation." *May* v. *Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997).

**[11]** We therefore conclude that a reasonable officer could have believed that restricting Norwood's outdoor exercise was consistent with the Eighth Amendment. Certainly, no authority clearly established the contrary. *Allen* didn't. *See* p.443 *supra*. And *Spain* v. *Procunier*, 600 F.2d 189 (9th Cir. 1979), concerned inmates in disciplinary segregation who were denied outdoor exercise as a normal condition of their confinement, *id.* at 199-200, rather than for safety during emergencies. Not surprisingly, our district courts have found an absence of Eighth Amendment liability on facts similar to these. *See, e.g.*, *Jones* v. *Garcia*, 430 F. Supp. 2d 1095, 1102-03 (S.D. Cal. 2006) (finding no Eighth Amendment violation where prisoner was denied outdoor exercise for ten months—double the longest single period that Norwood's exercise was restricted—because of ongoing violence); *Hayes* v. *Garcia*, 461 F. Supp. 2d 1198, 1201, 1207-08 (S.D. Cal. 2006) (same for nine-month denial of outdoor exercise); *Hurd* v. *Garcia*, 454 F. Supp. 2d 1032, 1042-45 (S.D. Cal. 2006) (same for five-month denial).

Norwood argues that defendants had no need to conduct lengthy lockdown investigations because those investigations either found that the initial assaults were isolated incidents or else could not determine who else was involved. Norwood also argues that defendants could have limited exercise restrictions to specific groups of prisoners. But the investigations were reasonable precautions, and defendants had no way of knowing beforehand what they would yield. That defendants imposed general lockdowns after some attacks on staff but only group-specific restrictions after some attacks on inmates does not show malicious intent or deliberate indifference. Attacks on staff are, by their nature, more serious challenges to prison authority than attacks on other inmates.

**[12]** We decline Norwood's invitation to micro-manage officials whose expertise in prison administration far exceeds our own, and we conclude that defendants are entitled to qual-

ified immunity. On remand, the district court shall enter judgment consistent with this opinion.

[13] Because plaintiff is no longer the prevailing party, we vacate the award of attorney's fees.

**REVERSED.**

---

THOMAS, Circuit Judge, dissenting:

There is no reason on this record to disturb the jury verdict. The district court correctly analyzed the law and properly instructed the jury consistent with our precedent. The jury considered all of the evidence and rejected the government's theory that defendants were not deliberately indifferent because security concerns justified the ongoing deprivations. Substantial evidence supports the jury verdict.

I would not reach the question of qualified immunity because the government did not preserve the issue for appeal. Assuming for argument's sake that it was proper for us to entertain the defense, I would hold that the defendants were not entitled to qualified immunity. Clearly established law precludes prison officials from depriving inmates of outdoor exercise for extended periods absent exigent circumstances. The jury's finding that defendants acted with reckless disregard to the risk to Norwood's health and safety leaves no room to conclude defendants could reasonably have believed their actions lawful.

For these reasons, I must respectfully dissent.

I

We afford trial judges "substantial latitude in tailoring jury instructions." *Mockler v. Multnomah County*, 140 F.3d 808,

812 (9th Cir. 1998) (citation omitted). Here, there is no doubt that the district court properly instructed the jury on the essential elements of the claim at issue. Indeed, the government concedes that the jury was properly instructed, and it did not object to the instruction given by the district court. What the government sought was an additional, misleading instruction that would have engrafted supplemental requirements onto those dictated by precedent. The district court found that the new instruction was unclear, undefined, and used language that would be confusing to a lay jury. A district court does not commit error in rejecting a misleading supplementary instruction that is at odds with a controlling instruction everyone agrees was properly given. "Jury instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Id.* (citation omitted).

This case involved a challenge to prison conditions—specifically, the long-term deprivation of outdoor exercise—to which the deliberate indifference standard applies. The jury was instructed that:

> To establish deliberate indifference plaintiff must prove defendant knew that plaintiff faced a substantial risk of serious harm to his health or safety and disregarded that risk by failing to take reasonable measures to correct it. Under the deliberate indifference standard, defendant must have been aware of facts from which the inference could be drawn that a substantial risk of serious harm to plaintiff's health or safety existed due to deprivation of outdoor exercise, and defendant must also have drawn that inference.

The jury was further instructed that "[a] defendant who actually knew of a substantial risk of a serious harm to plaintiff's health or safety may be found free from liability if he responded reasonably to the risk, even if the harm was not

ultimately averted." These instructions set forth—almost verbatim—the deliberate indifference culpability standard for cases involving challenges to prison conditions announced by the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994). *See id.* at 837 ("We hold . . . that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."); *id.* at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."). In combination with the instruction that exercise did not have to be provided if "inclement weather, unusual circumstances, or disciplinary needs makes that impossible," the instructions conveyed to the jury that it could not find defendants liable if the officials knew of the risk posed by continuing the lockdowns without providing for exercise, but responded reasonably to that risk under the circumstances.

The government agreed that the jury instruction that "exercise must be provided unless inclement weather, unusual circumstances, or disciplinary needs makes that impossible" was "an adequate and proper statement of the law." *See Allen v. Sakai*, 40 F.3d 1001, 1004 (1994) (stating that prison officials were required to "provide regular outdoor exercise to [the plaintiff] unless 'inclement weather, unusual circumstances, or disciplinary needs made that impossible'") (quoting *Spain v. Procunier*, 600 F.2d 189, 199 (1979) (Kennedy, J.))).

What the government sought was an additional instruction that amounted to a command to direct a verdict in favor of the government:

> In considering whether defendants were deliberately indifferent to the need for outdoor exercise, the jury

should consider that defendants had a competing obligation under the Eighth Amendment to ensure the safety of prisoners, including protecting prisoners from each other. In considering these factors, you should give deference to prison officials in the adoption and execution of policies and practices that in their judgment are needed to preserve discipline and maintain internal stability in a prison.

The district court rejected the proffered jury instruction because he found the deference language unclear and undefined, noting that "one of my jobs as a judge is to provide the jury with an understandable instruction, something that's clear to a lay person."

One cannot fault the district court's analysis.[1] The proposed instruction deviates from the Supreme Court's formulation of the standard of deliberate indifference in *Farmer*, and the district court rightly concluded it might be confusing to a lay jury.

The language sought by the government not only departed from the proper and time-tested definition of deliberate indifference, but also would have imported language that the Supreme Court has held is not proper for such cases. The deference language requested by defendants appears verbatim in the model Ninth Circuit jury instruction for prisoner *excessive*

---

[1]Indeed, by providing instructions defining deliberate indifference in *Farmer*'s terms, rather than using the current version of the Ninth Circuit Model Jury Instruction, the trial judge actually avoided error on another front. *See Clem v. Lomeli*, No. 07-16764, slip op. at 6574-75 (9th Cir. June 2, 2009) (holding that district court erred in providing current Ninth Circuit Model Jury Instruction 9.25 because the instruction deviates from *Farmer*, which does not require "direct causation by affirmative action" of prison officials); *id.* at 6577 (emphasizing that current Ninth Circuit Model Jury Instruction 9.25 does not adequately state the law because it never "mentions or defines the term 'deliberate indifference' ") (Hug, J., concurring).

*force* claims, in which the heightened subjective culpability standard set forth in *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986), applies.[2] *See* Ninth Circuit Manual of Model Jury Instructions § 9.24 (2007 ed.).

However, the *Whitley* excessive force standard, under which prison officials may be held liable only if they act "maliciously or sadistically for the very purpose of causing harm," *Whitley*, 475 U.S. at 321-22 (citation omitted), does not apply to claims challenging prison conditions. Indeed, our precedent forecloses such an application, and defendants do not argue otherwise. In *Johnson v. Lewis*, 217 F.3d 726 (2000), we held that where prisoners were held handcuffed and prone in a prison yard for four days after a riot, the heightened culpability standard announced in *Whitley* applied to the prison officials' actions *up to the point* when the inmates were secured, but that once the prison officials "were no longer required to make split-second, life-and-death decisions," the *deliberate indifference* standard applied. *Id.* at 734; *see also Jordan v. Gardner*, 986 F.2d 1521, 1528 (9th Cir. 1993) (en banc) (*Whitley*'s "maliciously or sadistically" standard applies "in the context of a prison-wide disturbance or individual confrontation between an officer and prisoner," when "corrections officers must act *immediately* and emphatically to defuse a potentially explosive situation") (emphasis added). As we explained in *Jordan*, the excessive force test involves the examination of "the exercise of judgment of a particular officer on a specific occasion," while the deliberate indifference test generally involves "polic[ies] . . . developed over time, with ample opportunity for reflection." *Jordan*, 986 F.2d at 1528.

---

[2]It is questionable whether this deference language is even properly included in jury instructions for excessive force cases. *See* Catherine T. Struve, *Constitutional Decision Rules for Juries*, 37 COLUM. HUM. RTS. L. REV. 659, 679 (2006) (arguing that including deference language in excessive force jury instruction double counts the deference due prison officials because the *Whitley* standard already incorporates deference).

The language that the government proposed in this case would have effectively imposed the more deferential standard we held inapplicable in *Johnson* and *Jordan*. The standards for excessive force claims are not coextensive with the standards applicable to prison conditions claims. In my view, not only was the trial judge justified in rejecting the instruction, the judge would have committed error if he had given it.

Defendants contend that the deliberate indifference standard "did not capture the importance of deferring to the expert judgment of prison officials concerning when outdoor exercise could safely be resumed." However, contrary to defendants' assertion, the deliberate indifference standard announced in *Farmer* and adopted by the trial judge in his instructions is a "standard that *incorporates* due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.' " *Farmer*, 511 U.S. at 845 (emphasis added) (citing *Spain*, 600 F.2d at 193). The Supreme Court in *Farmer* also cited its decision in *Bell v. Wolfish*, 441 U.S. 520 (1979), in support of the iteration of the deliberate indifference standard it adopted, indicating that the principle of deference to the judgment of prison officials undergirds the standard.[3] *See id.* It is a mistake to confuse the deference language surrounding the Supreme Court's announcement of the applicable standards in *Whitley* and *Farmer* with the standards themselves. *See* Catherine T. Struve, *Constitutional Decision Rules for Juries*, 37 COLUM. HUM. RTS. L. REV. 659, 679 (2006) (noting that deference lan-

---

[3]The majority argues that the requested instruction was required because its language was drawn from *Bell*, a case that involved a challenge to conditions of confinement, albeit in the pretrial detention context. However, *Bell* preceded the line of Supreme Court cases setting forth the current standards applicable to prison conditions cases—including the deliberate indifference standard. The deliberate indifference standard incorporates the level of deference the Court has deemed warranted in the context of challenges to prison conditions under the Eighth Amendment, as opposed to challenges to prison policies and practices under generally applicable constitutional provisions.

guage in *Whitley* "explain[s] the Court's choice of decision rule, but need not be seen as a part of that decision rule").

An instruction incorporating *further* deference would run afoul of the Supreme Court's rejection of such an approach in *Johnson v. California*, 543 U.S. 499 (2005). In *Johnson*, the Court expressly disavowed the applicability in the Eighth Amendment context of the standard articulated in *Turner v. Safley*, 482 U.S. 78, 89 (1987), namely that a "regulation is valid if it is reasonably related to legitimate penological interests." The Court reasoned that "the integrity of the criminal justice system depends on full compliance with the Eighth Amendment." *Johnson*, 543 U.S. at 511. In support of this assertion, the Court quoted with approval the following passage from Justice Kennedy's decision for this Court in *Spain*:

> [T]he full protections of the eighth amendment most certainly remain in force [in prison]. The whole point of the amendment is to protect persons convicted of crimes. . . . Mechanical deference to the findings of state prison officials in the context of the eighth amendment would reduce that provision to a nullity in precisely the context where it is most necessary.

*Id.* (quoting *Spain*, 600 F.2d at 194). Inclusion of the requested deference instruction, in light of the fact that the appropriate level of deference was already incorporated in the culpability standard, would have invited exactly the sort of "mechanical deference" the Supreme Court has rejected.

Further, *Farmer* suggests that it is *judges* at whom the deference language in the *Bell* line of cases is directed, and *judges* who must be mindful of the respective competencies of the judiciary and executive branches. *See Farmer*, 511 U.S. at 846-47 (noting that district courts should approach grant of injunctive relief in prison conditions cases with caution lest they become "enmeshed in the minutiae of prison opera-

tions") (quoting *Bell*, 441 U.S. at 562). *Farmer* does not suggest that this complex balancing of competing institutional interests should be placed directly in the hands of jurors. *See* Struve, *supra*, at 681-82 (arguing that not all judicial decision rules are appropriate for use as decision rules for juries). While juries, as part of the judicial branch, no doubt have an indirect role to play in this balancing process, they properly play this role by applying the standards the Supreme Court has determined strike the appropriate balance. The district court in this case accurately instructed the jury on those standards. In doing so, the district court in this case wisely recognized that not every general legal principle "lifted from the case law" is properly provided as instruction to the jury. The court correctly concluded that to give the government's double deference instruction would have been confusing to a lay jury.[4]

---

[4]The majority criticizes the trial judge on this point, contending that deference is a commonly understood lay term, and could not have been confusing. However, its citation of language in the novel *Airframe* illustrates the problem. Instructing a jury to give prison officials deference, if deference commonly "borders on fear," is not a correct application of the law and would have amounted to directing a verdict in favor of the government. Even in our sterile legal environment, deference comes in varietals, such as *Chevron* deference, *Skidmore* deference, and sardonic deference. *See, e.g.*, *Massiah v. United States*, 377 U.S. 201, 208 (1964) (White, J., dissenting) ("With all due deference, I am not at all convinced that the additional barriers to the pursuit of truth which the Court today erects rest on anything like the solid foundations which decisions of this gravity should require."). And, of course, there is more than one breed of institutional deference relevant to this case. *See, e.g.*, *McCord v. Maguire*, 873 F.2d 1271, 1274 (9th Cir. 1989) (correctly noting that we must be "mindful of the deference due the verdict of a jury") (citation omitted). Here, the trial judge quite rightly concluded that to give an instruction that mixed legal standards and, in effect, told the jury to layer deference upon deference, was not appropriate—particularly when the judge had already given an entirely proper instruction on the topic. (I must, however, acknowledge that the majority is quite correct in intuiting that, unsurprisingly, there is no Klingon word for "deference." *See generally* Marc Okrand, The Klingon Dictionary (Star Trek 1992)).

Because the relevant level of deference is already incorporated into the content of the culpability standards governing the conduct of prison officials, the district court correctly rejected the instruction. The requested instruction misstated applicable law and, as the district court properly concluded, would have been confusing to the jury. Moreover, everyone agrees that the primary instruction given by the judge on this issue was entirely proper. The trial judge properly rejected the defendants' proffered "deference" instruction, in favor of an instruction that everyone agrees correctly stated the applicable law.[5]

## II

The government did not preserve its qualified immunity defense for appeal. The rules for preserving a qualified immunity defense are straightforward. Qualified immunity is an affirmative defense that must be pleaded in the answer. *Siegert v. Gilley*, 500 U.S. 226, 231 (1991). However, "defendants may raise an affirmative defense for the first time in a motion for summary judgment . . . if the delay does not prejudice the plaintiff." *Magana v. Commonwealth of N. Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir. 1997).

---

[5]Although I have elected to discuss this issue on the merits, there is considerable force to the plaintiff's argument that the government failed to preserve the question for appeal. Under Fed. R. Civ. P. 51(d)(1)(B), a party may assign as error "a failure to give an instruction, if that party properly requested it and—unless the court rejected the request in a definitive ruling on the record—also properly objected." (emphasis added). As I have noted, at the conference at which the instructions were discussed, the trial judge indicated that he found the government's proposed instruction confusing and indicated that he was not inclined to give it. However, he also stated, "at this juncture, you may have an opportunity to show me that I'm wrong later, I think the plaintiff's position is correct." At the critical moment in the trial, when the judge asked for objections to the instructions as given, the government stated that it "will not object to any of the instructions" except to "renew the defendants' request for failure to mitigate." The government did not, at the critical juncture when formal objections were to be made, request that the court give the additional deference instruction.

If the district court denies qualified immunity on a summary judgment motion, the order is immediately appealable as a collateral order if the judgment is made as a matter of law and "the issue appealed concerns whether the facts demonstrated a violation of clearly established law." *Rodis v. City and County of San Francisco*, 558 F.3d 964, 968 (9th Cir. 2009) (citation omitted). If the district court denies summary judgment on qualified immunity because there remain genuine issues of material fact, then there is no right of interlocutory appeal, because such an order is not a "final, immediately appealable order." *Maropulos v. County of Los Angeles*, 560 F.3d 974, 975 (9th Cir. 2009) (per curiam); *see also KRL v. Estate of Moore*, 512 F.3d 1184, 1188-89 (9th Cir. 2008) ("Our jurisdiction is limited to questions of law, and does not extend to qualified immunity claims involving disputed issues of material fact.").

If the district court denies qualified immunity because there are genuine issues of material fact, then the case proceeds to trial. "When a qualified immunity claim cannot be resolved before trial due to a factual conflict, it is a litigant's responsibility to preserve the legal issue for determination after the jury resolves the factual conflict." *Tortu v. Las Vegas Metro. Police Dep't.*, 556 F.3d 1075, 1083 (9th Cir. 2009). To preserve the issue of qualified immunity, the defendants must make a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a). *Id.* The Rule 50(a) motion must be filed "at any time before the case is submitted to the jury." *Id.* at 1081. A party may also renew the motion for judgment as a matter of law based on qualified immunity after trial under Fed. R. Civ. P. 50(b). However, a "failure to file a Rule 50(a) motion precludes consideration of a Rule 50(b) motion for judgment as a matter of law." *Id.* at 1083. Filing a motion for summary judgment or raising the issue in pre-trial submissions is not sufficient to avoid a waiver. *Id.* at 1082.

Here, defendants raised qualified immunity as an affirmative defense and moved for summary judgment. The district

court denied summary judgment because there were genuine issues of material fact. In their pretrial statement, defendants acknowledged that their motion for qualified immunity had been denied based on the existence of material factual disputes and stated that their "entitlement to qualified immunity at trial will depend on what evidence is produced to the court for determination of this issue."

The case proceeded to trial. Defendants did not request that the judge give any instructions to the jury pertinent to the immunity defense. Defendants did not file a Rule 50(a) motion for judgment as a matter of law before the case was submitted to the jury. Nor did defendants file a renewed motion for judgment as a matter of law pursuant to Rule 50(b) after the verdict was rendered. In fact, after a jury was seated, the issue of qualified immunity was never mentioned again in the district court. At oral argument, defendants conceded that they provided the district court no opportunity to rule on the question whether, on the facts established at trial, they were entitled to qualified immunity. Defendants offered no argument or explanation as to why the issue should not be deemed forfeited. Plainly, defendants did not preserve their post-trial assertion of qualified immunity for appeal. *Under Tortu*, the government has forfeited its qualified immunity defense, and we should not consider it for the first time on appeal.

The majority quite rightly notes that the plaintiff did not raise the issue of waiver in its appellate briefing, which was a serious omission. That omission places the question of whether to entertain the government's belated qualified immunity argument within our sound discretion. I would not choose to exercise such discretion.[6] By entertaining an appeal

---

[6] We have never held that we must reach the merits of an immunity defense abandoned by the government below when the plaintiff fails to argue waiver in the briefs. While the majority cites several of our cases for the proposition that the Court does not address waiver if not raised by the opposing party, none of these cases involved a party's failure to raise

based on a defense abandoned at trial, we impose on trial judges the untenable duty of *sua sponte* re-examining a jury verdict in light of abandoned defenses. The Rules set forth the procedure for raising legal challenges to jury verdicts: making a motion for judgment as a matter of law. The requirement is critical not only to the structure of the adversary system, but to our appellate system in which the trial court considers legal arguments in the first instance. There are, of course, exceptions to this general rule and, from time to time, we have indulged new legal arguments for the first time on appeal. However, I would not make an exception in this case with the effect of imposing a new duty on the trial court *sua sponte* to consider abandoned defenses after the jury has issued its verdict.

## III

Assuming that the question of qualified immunity is properly before us, I would hold under the circumstances presented here that a reasonable officer could not have believed the exercise deprivations in this case were lawful. Because the government did not preserve the issue for appeal, we review

properly a defense to liability in the trial court. *See Tokatly v. Ashcroft*, 371 F.3d 613, 618 (9th Cir. 2004) (government waived argument that petitioner had waived argument before the immigration judge); *United States v. Garcia-Lopez*, 309 F.3d 1121, 1123 (9th Cir. 2002) (government expressly waived argument that defendant had waived his right to appeal as part of plea agreement); *United States v. Doe*, 53 F.3d 1081, 1082-83 (9th Cir. 1995) (where government urged court at oral argument to decide issue on merits, argument that defendant had waived challenge to sentence by not raising it on direct appeal was waived); *United States v. Lewis*, 787 F.2d 1318, 1323 n.6 (9th Cir. 1986) (court declined to address government's argument, raised for the first time in petition for rehearing, that defendant had waived instructional error argument in trial court). Because deciding in the first instance the applicability of an abandoned defense to liability after a general jury verdict implicates concerns not present in these cases, I would not extend the "waiver of waiver" principle to this new context.

the claim under the familiar plain error standard. To prevail on plain error review, the government must show (1) that the proceedings below involved error, (2) that the error is plain, and (3) that the error affected the substantial rights of the aggrieved party. *United States v. Olano*, 507 U.S. 725, 732-35 (1993). In addition, the government must also show that the alleged error—here, the trial judge's failure, after the evidence was presented, *sua sponte* to enter judgment as a matter of law for defendants based on qualified immunity— " 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings' before we will exercise our discretion pursuant to Rule 52(b) to correct the plain error." *United States v. Alferahin*, 433 F.3d 1148, 1154 (9th Cir. 2006) (en banc) (internal quotation marks omitted).

To prevail on his Eighth Amendment prison conditions claim, Norwood had to establish that he was subjected to an objectively serious deprivation and thatprison officials were deliberately indifferent to his health or safety. *Farmer*, 511 U.S. at 834; *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). As the trial judge correctly instructed the jury, and defendants conceded in their pretrial statement, the complete denial of outdoor exercise for periods of up to four and one-half months satisfies the objective prong of the *Farmer* test. Indeed, it was clearly established at the time of the lockdowns involved in this case that the complete deprivation of outdoor exercise for periods of two to four and one-half months constituted an objectively serious deprivation for purposes of the Eighth Amendment.

Thirty years ago, we recognized that "some form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates." *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979). In *Spain*, we held that inmates classified as dangerous due to violent acts in prison and confined to a disciplinary unit were entitled to regular outdoor exercise. Subsequent cases in our circuit clearly establish that the denial of outside exercise for extended peri-

ods "is a sufficiently serious deprivation and thus meets the requisite harm necessary to satisfy *Wilson*'s objective test." *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993). In *LeMaire* we noted that "this circuit has determined that the long-term denial of *outside* exercise is unconstitutional" but found no violation where a prisoner had both "abused [his outdoor exercise privileges] and represent[ed] a grave security risk when outside his cell." *Id.* at 1458. Shortly after *LeMaire*, in *Allen v. Sakai*, 40 F.3d 1001 (9th Cir. 1994), we held that prison officials were not entitled to summary judgment on grounds of qualified immunity where the plaintiff prisoner was provided only 45 minutes of exercise per week during a six-week period. We stated that in light of our prior cases, "it should have been apparent to defendants that they were required to provide regular outdoor exercise to [the plaintiff] unless 'inclement weather, unusual circumstances, or disciplinary needs made that impossible.' " *Id.* at 1004 (citing *Spain*, 600 F.2d at 199). And, while we noted in *May v. Baldwin*, 109 F.3d 557 (9th Cir. 1997), that "a temporary denial of exercise with no medical effects is not a substantial deprivation," *id.* at 565, *May* involved the denial of exercise for only 21 days as opposed to the four deprivations of two to four-and-one-half months in this case, totaling more than a year out of a period of less than two years.

We have held that in cases of genuine emergency, the *temporary* deprivation of outdoor exercise may not violate the Eighth Amendment. In *Hayward v. Procunier*, 629 F.2d 599 (9th Cir. 1980), we upheld a district court's grant of summary judgment to prison officials but specifically noted that the lockdown was "temporary and plaintiffs . . . were allowed approximately the minimum exercise mandated in *Spain* within a month after the imposition of the lockdown." *Id.* at 603. We premised our holding on the fact that the district court had "carefully reviewed the restrictions of the lockdown in light of the emergency at the prison and determined that they did not cross the eighth amendment line." *Id.* Similarly, in *Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir. 1982), after not-

ing that "when a genuine emergency exists, prison officials may be more restrictive than they otherwise may be, and certain services may be suspended *temporarily*," *id.* at 1259 (emphasis added), we remanded to the district court to consider "the length of time each restriction was in effect, and whether the restriction and its duration bore a relationship to legitimate attempts to ease the emergency." *Id.*

In this case, the magistrate judge denied summary judgment for defendants on the grounds that there were genuine issues of fact regarding whether an emergency necessitated the months-long complete deprivations of outdoor exercise in this case. The magistrate judge also found a genuine issue of fact existed as to whether during these periods other arrangements for outdoor exercise were feasible—for example, in small groups on the smaller concrete yards. Finally, the magistrate judge found disputed facts regarding defendants' representation that an extended lockdown depriving *all* inmates of physical exercise was called for where violence was precipitated by identifiable groups. In short, the magistrate judge found that these factual issues—material to both the deliberate indifference and qualified immunity inquiries—were disputed. The precise circumstances surrounding the continuation of the four lockdowns without any arrangements for outdoor exercise were deemed issues of fact for trial.

The case proceeded to trial before a jury, and the jury heard testimony from defendants describing the circumstances surrounding the decisions to continue the total lockdowns, the feasibility of providing outdoor exercise in smaller groups on the mini-yards, and the officers' opinions as to the harmfulness of exercise deprivation. After hearing all the evidence, the jury found that the defendants had been deliberately indifferent in failing to provide Norwood access to outdoor exercise during each of the four lockdown periods. Furthermore, the jury determined that Norwood was entitled to punitive damages. To do so, the jury had to find that the defendants were not merely deliberately indifferent to the risk to Nor-

wood's health posed by the deprivation of outdoor exercise, but that defendants' conduct was "malicious, or in reckless disregard of plaintiff's rights."

In determining whether the facts established entitle defendants to qualified immunity, "the party that prevailed at trial is entitled to have the evidence construed in a light most favorable to it, and the question is whether the evidence was so one-sided that one party would have to prevail as a matter of law." *Thompson v. Mahre*, 110 F.3d 716, 721 (9th Cir. 1997) (citing *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 181 (9th Cir. 1989)); *see also Jennings v. Jones*, 499 F.3d 2, 7 (1st Cir. 2007) (holding that where defendants press qualified immunity after a general jury verdict, the court is required to view facts relevant to qualified immunity determination "in the light most favorable to the verdict"). Here, the jury found defendants acted not merely with deliberate indifference to Norwood's right to outdoor exercise, but with *reckless disregard* for it. The evidence viewed in light of that finding does not support a defense of qualified immunity, which requires that defendants reasonably believed their conduct to be lawful.

The government relies on a number of factual claims that were disputed at trial, and which the verdict indicates the jury rejected. For example, the government asserts that after the lockdowns, the officials gradually eased restrictions "based on what they learned." In fact, the jury heard testimony from prison officials that they "never even received anonymous information that a group, or any specific . . . inmate was involved in these plots to assault staff other than the perpetrators" who were identified on the day of the first two attacks. The jury also heard evidence that contradicted prison officials' statements that they did not know if other inmates, including inmates of other races, were responsible for the first attack.[7] Finally, with regard to the attack precipitating the

---

[7] With regard to the first attack on staff by Hispanic inmates, Norwood tendered evidence that staff "believed it was likely that the Southern Hispanics had put a hit out on staff" and that, generally speaking, Southern Hispanic and black inmates were unlikely to form alliances.

fourth lockdown, Norwood tendered evidence that prison officials knew shortly after—and perhaps before—the attack that the lone perpetrator, a Crip gang member, had specifically targeted the staff member who was attacked and was *already* on lockdown status at the time of the attack because prison staff had information that Crip inmates were going to assault someone in the facility.

Similarly, the government notes that Norwood, who was not affiliated with any prison gangs, was locked down after the attacks instigated by known gang members because "gang members often pressured unaffiliated inmates of the same ethnicity to assist them." However, Norwood tendered evidence —in the form of numerous memoranda from prison officials to staff and inmates—that the usual course of action after a violent incident was to lock down those inmates closely identified with the group to which the attacker belonged, for example, Crip inmates in the case of an incident involving Crips. Furthermore, Defendant Pliler conceded that pressuring and violence among races and gangs occur during normal programming and that "[t]hat's the nature of the prisoner at the prison."

The majority claims that the fact that defendants imposed general lockdowns after attacks on staff but only group-specific restrictions after attacks on inmates "does not show malicious intent or deliberate indifference." The majority also states that "plaintiff offered no evidence that the lockdowns were meant to be punitive or were otherwise implemented in bad faith." However, the jury thought otherwise, rejecting the defendants' testimony that the exercise deprivations were motivated primarily by the officials' concerns for safety and security.

Finally, the majority suggests that defendants reasonably decided to continue the lockdowns given the occurrence of violent incidents during and after lockdown periods. However, defendants conceded on cross-examination that "those

types of incidents occur even when there is no lockdown" *with the same frequency*, and that "the violence is pretty steady." Thus, the jury reasonably rejected defendants' argument that they believed the unusual levels of violence justified the long-term deprivations in this case. Indeed, defendants' argument that the circumstances here were "unusual" and excused the exercise deprivation is belied by the length of the lockdowns, which persisted for periods totaling over one year out of a twenty-two month period.

In sum, the evidence as to the necessity of the long-term exercise deprivations at issue in this case, viewed in light of the jury verdict for Norwood, does not provide a sufficient basis for determining, as a matter of law, that defendants were entitled to qualified immunity. The alleged error of the trial judge in failing *sua sponte* to grant qualified immunity certainly does not rise to the level of plain error. The district court did not commit error—much less a plain error—and it would be hard to imagine a trial court decision less likely to "seriously affect the fairness, integrity or public reputation of judicial proceedings" than a decision not to give a jury instruction that the trial judge determined would be confusing to the jury. Thus, if I were to reach the merits of the qualified immunity defense, I would affirm the judgment of the district court.

## IV

The district court correctly applied the law and instructed the jury according to controlling precedent. The jury, after hearing a full evidentiary presentation, rejected the defendants' justification. The government failed to preserve the defense of qualified immunity for appeal. Indeed, the government did not even mention the affirmative defense after the jury was seated, much less make the appropriate motion to present the question to the district court for its consideration. The district court did not commit error, much less plain error, in not *sua sponte* granting judgment as a matter of law after

trial based on an abandoned affirmative defense. There is no justification for overturning the jury's verdict.

I respectfully dissent.